## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CYNTHIA L. ROBINSON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: **CV-04-0229-RP** |
| | ) | |
| **EQUIFAX INFORMATION** | ) | |
| **SERVICES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Speedway SuperAmerica LLC's Motion for Summary Judgment, filed on June 13, 2005.

## FACTS[1] AND PROCEDURAL HISTORY

Plaintiff Cynthia L. Robinson ("Robinson") is a citizen of Alabama. (Cmpt. ¶ 2). Defendant Speedway SuperAmerica, LLC ("SSA") is a Delaware corporation with its principal place of business in Ohio. (*Id.* at ¶ 3). Defendant Equifax Information Services, LLC ("Equifax") is a Georgia corporation with its principal place of business in Georgia. (*Id.* at ¶ 5).

Robinson, age 46, is a Deputy Clerk employed by the United States District Court for the Southern District of Alabama. (Robinson Depo., pp. 57, 60-61). She graduated from Alabama A&M University in 1981 with a degree in office management. (*Id.* at 60). Robinson has been employed by the federal court system since her graduation from college. (*Id.* at 61).

---

[1] The court notes where "facts" appear disputed.

Robinson testified that she met Charles A. Dunn, III ("Dunn"), also known as "Lethal," in 1997. (*Id.* at 12-13, 46).  From 1997 to 2002, Robinson and Dunn were involved in an off-and-on romantic relationship.  (*Id.* at 11, 14-17).  In or around 2001, Robinson assisted Dunn in starting a business known as "Lethal's Landscaping."  (*Id.* at 17, 22).

Robinson co-signed and personally guaranteed certain credit accounts that Dunn opened for Lethal's Landscaping.  (*Id.* at 19-22).  To open those accounts, Robinson permitted Dunn to use her name and her social security number.  (*Id.* at 34-35).  Robinson also agreed to become the corporate treasurer of Lethal's Landscaping.  (*Id.* at 22).[2]

In December 2001, Dunn submitted a credit application to SSA on behalf of Lethal's Landscaping.  Steve O'Hara ("O'Hara"), the former Supervisor of Credit Services for SSA, testified that SSA owns and operates a chain of gas station/convenience stores.  (O'Hara Affid., p. 1).  In a March 29, 2002 letter, SSA denied the credit application submitted by Dunn.  In the letter, SSA

---

[2] Robinson acknowledges that she gave Dunn her identifying information, but denies that she ever authorized him to open a SSA account.  Robinson stated that she gave Dunn her social security number so that he could use it to acquire a permit needed to open Lethal's Landscaping.  (Robinson Depo., pp. 34-35).  However, concerning other credit accounts, Robinson testified:

> Q:   Did you have any bank accounts that you shared with [Dunn]?
> A:   No.
> Q:   Credit cards?
> A:    A couple that I was co-signer, yes.
> Q:   Let me get this straight: You co-signed for credit cards that he got; is that right?
> A:   Yes.
> Q:   What companies were those?
> A:   Lowe's, Home Depot, AmSouth, I think Office Max or Depot.  I get those confused.

(*Id.* at 19).

offered to reconsider its denial if one of Lethal's Landscaping's officers had an acceptable credit standing and executed a personal guarantee on the account.  In response to this offer, SSA was given Robinson's name, as treasurer.  (O'Hara Depo., pp. 28-29).  SSA then sent an April 24, 2002 letter addressed to Robinson, as treasurer of Lethal's Landscaping, to the business' address.  This letter again offered to open a credit account for the company upon receipt of an executed personal guarantee form, which was enclosed with the letter.

In May 2002, SSA received a personal guarantee signed "Cynthia Robinson" and witnessed by Dunn and another officer of Lethal's Landscaping, Arthur Cabbill.  Because Robinson had an acceptable credit rating, SSA extended commercial credit to Lethal's Landscaping.[3]

---

[3] SSA acknowledges that Robinson was not the account applicant, owner, or debtor.  According to SSA, she was solely a personal guarantor.  Robinson denies that she was a personal guarantor on the account.

Robinson has submitted an expert report and affidavit by David Stivers ("Stivers").  In the report, Stivers gave several opinions including the following:

> Speedway management exercised control over the day-to-day customer credit application process, neglecting to maintain a reasonable standard of care to prevent one's identity from being used to issue cards to impostors, thereby damaging Ms. Cynthia Robinson.

(Stivers Affid., p. 6, ¶ 8).

SSA moves to strike portions of Stivers' affidavit.  Stivers testified:

> Upon discovery of unauthorized credit taken out in Ms. Robinson's name Speedway had a duty to take action to ensure that her credit reputation was restored, and that any resulting derogatory credit references were deleted.

(*Id.* at 31).  SSA moves to strike this sentence, arguing that it improperly states a legal conclusion as to SSA's duty to the plaintiff and is not based upon personal knowledge of the affiant.  Moreover, SSA

3

A single credit card was issued to Lethal's Landscaping in May 2002. (O'Hara Depo., p. 50). According to documents submitted by SSA and O'Hara's testimony, by October 2002, approximately $400 of gasoline purchases had been charged to the account. (O'Hara Depo., pp. 42-43). However, no payments were ever made on the account.

On October 23, 2002, SSA closed the account and declared it in default. According to SSA, it then unsuccessfully attempted to collect the debt from Lethal's Landscaping and Dunn by sending several letters and leaving several phone messages over the following month and a half.

On November 7, 2002, SSA sent a letter by certified mail to Robinson at her home address.[4]

---

argues, it is an incorrect statement of the law.

> Stivers also stated:
>
>> As a courtroom clerk, Ms. Robinson's career involves a high level of trust conferred upon her by our federal government, and it is likely that her own career path . . . whether in the same occupation or seeking a better job in a related work field . . . will lead her into other levels of work-related responsibility. Her employment longevity, for almost 24 years attests to her being responsible.
>
> (*Id.* at 33). According to SSA, this passage should be struck because it is based solely on speculation and conjecture and not upon personal knowledge. This court will not consider these proposed opinions of Stivers. They are conclusory and involve no indicated expertise.

[4] Robinson testified that, prior to receiving this letter, an agent of SSA called to inform her that the account was delinquent and that she told the agent that she did not have an account with SSA. (Robinson Depo., p. 9). Robinson stated that the agent asserted that "he had a piece of paper with [her] signature on it . . . and that he was going to do what he [could] to get the money." (*Id.* at 10). Regarding this communication, Robinson testified as follows:

> Q:    From the information that you provided them, Speedway had no way of knowing that you were alleging that your signature was forged on the personal guaranty, right?
> . . .
> A:    They would not have known.

This letter stated as follows:

> Re: Lethals Landscaping & Lawn Care
> Account # 1000793305
> Balance Due: $451.72
>
> Dear Ms. Robinson,
>
> Our records indicate this account has been closed for delinquency and we have been

---

> Q:    And even after the lawsuit was filed with the April 28th, 2004 dispute verification form . . . there is still no mention of forgery, right?
> A:    Right.
> Q:    Ms. Robinson, what exactly do you think that Speedway should have done differently?
> A:    When the guy called me and I told him that it was – that I don't have a Speedway account, he was ugly to me. He was real ugly to me. And he should have I guess just asked me more questions right then. He should have asked me more questions about the account to see whether or not it was actually my account or whether or not it was forged. Because I informed him it was not my account. I don't have a Speedway account with them. But he was rude. . . .

(*Id.* at 104).

Robinson also received a second call from a person wanting to collect on the account. Regarding that conversation, Robinson stated:

> Q:    What did you say to him?
> A:    I – I'm quite sure I told him the same thing. That I don't have a Speedway account. But he told me an amount that they would be willing to accept and for me to call him back and let him know what I was going to do about the account.
> Q:    Did you call him back?
> A:    No.

(*Id.* at 31).

According to Robinson, when she approached Dunn concerning the account, he told her that he only used her as a reference on the account. (*Id.* at 25).

5

unable to work out a repayment plan.  We have a Personal Guarant[ee] signed by you on May 2, 2002.  This document makes you personally responsible for the fuel account with Speedway SuperAmerica LLC.  You are currently in material breach of your agreement and Speedway SuperAmerica LLC will take whatever action they decide is necessary to collect the amount owed.  This action includes, but is not limited to, using the Guaranty letter in our files to change the name on the account to Cynthia Robinson and reporting the entire balance due to your personal credit report.

Please contact me about payment on this account at the telephone number listed below. . . .

Robinson testified that she signed for and received this letter.  (Robinson Depo., pp. 38-39).  Robinson stated that she read the letter, but ignored it.  (*Id.* at 38-42).  She did not call the number on the letter or make any other inquiry regarding it.  (*Id.*)

When the November 7, 2002 letter was sent to Robinson, the account was still classified as a commercial account in the name of Lethal's Landscaping.  (O'Hara Depo., pp. 63-64; O'Hara Affid., p. 2).  O'Hara testified that, prior to December 9, 2002, no efforts had been made to collect from Robinson,[5] and no adverse (or other) credit information affecting Robinson had been published or otherwise reported.  (*Id.*)

Robinson testified that sometime before receiving SSA's letter, she was contacted by representatives of American Express and Staples Office Supplies who were seeking to collect on credit accounts opened by Dunn.  (Robinson Depo., pp. 143-51).  Robinson testified that Dunn had forged her signature on the two accounts.  (*Id.*)  She paid off the two accounts, a total of approximately

_____

[5] Robinson disputes O'Hara's statement that no efforts were made to collect the debt from her prior to December 9, 2002.  According to Robinson, prior to this date, she received two telephone calls and a letter from SSA's agents, the sole purpose of which was to collect the debt.  (Robinson Depo., pp. 8-11, 30-31, 38-41).

$2,400.  (*Id.*)

After receiving SSA's November 7, 2002 letter, Robinson did not go to the police concerning the guarantor form submitted to SSA.  (*Id.* at 53-55).  Robinson also did not send anything to Equifax or SSA to prove that the signature on the personal guarantee was not hers.  (*Id.* at 89-90).  Robinson testified that she did not contact SSA to explain that she had not signed the personal guarantee.  (*Id.* at 84-85).  On December 9, 2002, SSA converted the account to a consumer account in Robinson's name.

Sometime thereafter, Robinson applied for a residential real estate mortgage with Key Financial.  (Robinson Depo., pp. 64-67).  She asserted that she was initially refused the loan because of the delinquent SSA account on her credit report.  (*Id.*)  Robinson testified that, in November 2003, she obtained a copy of her Equifax credit report.  (Robinson Depo., p. 76).  Afterward, Robinson filled out an Equifax "Research Request Form."  (*Id.* at 88-89).  Under the section marked "Reason for investigation," Robinson checked "Not Mine."  Although there was space provided for explanation (marked "Others please explain")), Robinson did not provide a further explanation.  Nowhere on the form did she mention forgery, fraud, or identity theft.[6]  Robinson testified that, when she requested the investigation, she expected that the Speedway account would be removed from her credit report.  (*Id.* at 167).  In addition to sending the Research Request Form to Equifax, on November 24, 2003, Robinson also sent a letter to Experian Information Services indicating that she had never had an

---

[6] Robinson maintains that she checked that appropriate box on the Research Request Form because, at that time, she was not aware of the forged document, but knew only that the account was not hers.

account with SSA.  As of November 29, 2004, Robinson's credit report indicated that the SSA

account was seriously past due and had been assigned to an attorney.

On December 1, 2003, a Consumer Dispute Verification form ("CDV") was sent by Equifax to

SSA.  In the comments section, which explains the nature of the consumer's dispute, the CDV states:

"NOT HIS/HERS.  PLEASE PROVIDE COMPLETE ID."  There is no mention on the CDV of

forgery, fraud, or identity theft.  (Robinson Depo., pp. 86-87).

According to O'Hara's affidavit testimony, the CDV was received and reviewed by Don

Ridenour of SSA.  (O'Hara Affid., p. 2).  O'Hara testified that Ridenour cross-checked the

information from the CDV to that contained in SSA's computer records and physical files.  (*Id.*)  As

the information matched, Ridenour confirmed that the account belonged to Robinson and returned the

CDV to Equifax on or about December 7, 2003.  (*Id.*).[7]

Equifax sent a letter, dated December 12, 2003, to Robinson showing the results of the

investigation, and explaining that SSA had verified the account as belonging to her.  Included in the

communication was the following notice:

---

[7] In her Amended Response to Defendant's Statement of Facts, Robinson notes that in his
deposition, as opposed to his affidavit, O'Hara did not testify as to what Ridenour did, but as to what
he would have normally done under SSA's procedures after receiving a CDV.  (O'Hara Depo., pp.
85-89).  Robinson maintains that "[t]here is no evidence that Ridenour checked the physical file and/or
looked at the personal guarantee other than O'Hara's supposition."  (Plaintiff's Amd. Resp. to
Defendant's Stmt. of Facts ¶ 35).

Additionally, Robinson has submitted an expert affidavit by Evan Hendricks ("Hendricks"),
who has written a number of documents on credit scores and credit reports.  Among other things in his
affidavit, Hendricks stated his opinion that SSA failed to conduct an adequate reinvestigation after
receiving notice of Robinson's dispute.  (Hendricks Affid., p. 12).

> If you still disagree with an item after it has been verified, you may send to us a brief statement, not to exceed one hundred words . . ., explaining the nature of your dispute. Your statement will become part of your credit file and will be disclosed each time that your credit file is accessed.

Robinson testified that she did not read this notice and did not prepare or send such a statement. (Robinson Depo., pp. 90-91).

On April 28, 2004, Equifax sent another CDV to SSA.  It stated in the comments section, "INACCURATE INFORMATION.  NEED COMPLETE ID/ACCOUNT INFORMATION."  The CDV did not mention forgery, fraud, or identity theft.  On May 4, 2004, SSA again verified the information as correct.

Robinson testified that nothing she sent to SSA ever mentioned forgery, fraud or identity theft. (Robinson Depo., pp. 102-04).[8]  On January 20, 2005, SSA deleted the disputed account from its reports to CRAs.  (O'Hara Depo., p. 97).

According to Robinson, the reporting of the delinquent SSA account on her credit report has caused her problems.  She testified:

> Q:  You have also stated that the incorrect information has caused you embarrassment.
> A:  Uh-huh.
> Q:  Tell me how it has caused you embarrassment.
> A:  I had to file this lawsuit and I work at federal court and I guess the judge could not handle it and so they got an out-of-town judge to handle this lawsuit.  And I'm just glad that the discovery is only the first and second page.  I would hate for the people to pry so much into my personal life at work.  So I am embarrassed because I had to file this lawsuit.

---

[8] SSA asserts that it was not until discovery in this lawsuit began that it was made aware of Robinson's claim that the personal guarantee had been forged.  Robinson notes that SSA does not cite to the evidentiary record to support this assertion.

| Q: | When you wrote this letter, it was before you filed the lawsuit, right? |
| A: | Yes. It was. |
| Q: | How were you embarrassed at that point? |
| A: | Embarrassed also that my credit is not good.  Embarrassed if I wanted to get a car loan, that they had to look at my credit and see, she – her credit is not good. |
| Q: | Have you tried to get a car loan? |
| A: | I'm scared to. |

(Robinson Depo., pp. 139-40).

Robinson filed this action on April 13, 2004, naming Equifax and SSA as defendants.  The

Complaint contained the following five counts: (1) Count One – Failure to Comply with § 1681s-2(b)

of the Fair Credit Reporting Act ("FCRA") by SSA[9]; (2) Count Two – State Law and FCRA

Violations by Equifax; (3) Count Three – Defamation by Equifax and SSA[10]; (4) Count Four –

_____

[9] Count One alleges in part:

> After receiving notice of the dispute from Plaintiff and Defendant EQUIFAX, Defendant SPEEDWAY:
>
> a. Failed to conduct an adequate investigation with regard to the disputed information;
>
> b. Failed to review all relevant information provided by the consumer and provided by consumer reporting agencies;
>
> c. Failed to promptly investigate and report the investigation of the consumer to consumer reporting agencies continued to report the same misleading and inaccurate information complained of above and otherwise violated the FCRA.

(Cmpt. ¶ 16).

[10] Count Three alleges that between 2002 and the present, defendants knowingly published, both orally and in writing, false information that plaintiff was delinquent in paying her account.  (Cmpt. ¶¶ 32-36).  Count Three further asserts:

> The written publications by Defendants constitute liable per se.  The verbal publications

Negligence and Wantonness by SSA[11]; and (5) Count Five – Request for Declaratory Judgment.[12]

On May 10, 2004, SSA filed a Motion to Dismiss Robinson's state law claims.  This motion

constitute slander per se.

Despite Plaintiff's notice, Defendants acted with malice by attempting to coerce Plaintiff into paying for charges that were not hers.  Moreover, Defendant SPEEDWAY acted with malice by obstructing the reinvestigation of Plaintiff's consumer disputes when it advised credit reporting agencies, credit grantors, and collection agencies that the disputed account was that of the Plaintiff.  Defendants' acts constitute express or actual malice.

As a direct and proximate result of Defendants' defamation, Plaintiff has suffered extreme mental anguish, loss of reputation, loss of ability to obtain credit, mental anguish, and suffering, and pecuniary damages.  The losses are either permanent in nature or continuing and Plaintiff will suffer losses in the future.  Defendants' actions were malicious, willful, wanton, and to the total disregard of Plaintiff's rights.

(*Id.* at ¶¶ 37-39).

[11] Count Four alleges in part:

At all times relevant hereto Defendant SPEEDWAY owed a duty of reasonable care to the Plaintiff, a person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom credit cards were given was not an imposter.

Defendant SPEEDWAY's breach[ed] . . . this duty resulting in damages . . .

Defendant SPEEDWAY's breach of its duty to plaintiff was reckless and wanton . . .

(Cmpt. ¶¶ 42-44).

[12] Among other things, Count Five requests that the court:

Issue a judgment declaring the disputed information being reported by Defendant SPEEDWAY as not of the Plaintiff and to have Defendant cease its reporting to any and all credit reporting agencies . . .

(Cmpt. ¶ 46).

argued that Robinson's state law claims were preempted by 15 U.S.C. § 1681t(b)(1)(F).  On August

10, 2004, this court granted in part and denied in part SSA's Motion to Dismiss the state law claims.

In a Memorandum Opinion issued on that day, the court concluded:

> (1) To the extent that the claims of Counts Three and Four involve publication to various "credit reporting agencies," the allegations clearly pertain to the subject matter regulated under Section 1681s-2 and any such state law claims are preempted regardless of any notice of dispute.

> (2) As to allegations in Counts Three and Four involving collection agencies and attorneys, this court concludes that said claims are also preempted to the extent that any publication or report to any such attorneys or collection agencies came via publication to credit reporting agencies, but not as to any such report or publications directly from Speedway to such attorneys or collection agencies.

Further, on March 10, 2005, pursuant to a written stipulation of the parties, all of Robinson's

claims against Equifax were dismissed with prejudice.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery,

and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial

burden of explaining the basis of his motion.  *Celotex*, 477 U.S. at 323.  "It is never enough [for the

movant] simply to state that the non-moving party could not meet their burden at trial."  *Mullins v.*

*Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party then

bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial.

*Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).  Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial.  *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS[13]

I.      **SSA's Motion.**

      A.      **Under the FCRA and the Case Law Interpreting It, SSA Conducted a Reasonable Investigation Based Upon the Information Plaintiff Provided.**

SSA notes that the FCRA regulates the conduct of both credit reporting agencies ("CRAs") and those entities that furnish credit information to the CRAs ("furnishers").  *See generally* 15 U.S.C.

---

[13] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.  The court has considered correctly cited and quoted cases.

§§ 1681 - 1681v.  According to SSA, under FCRA dispute procedures, in order to have standing to

sue under that Act, a consumer must dispute any inaccurate or incorrect credit information that appears

on her credit report with the CRA that generated the report.[14]  *See* 15 U.S.C. § 1681i (discussing

procedures in cases of disputed accuracy of credit reports).  SSA asserts it is then the CRA's duty to

promptly notify the furnisher about the dispute, providing the furnisher with all the information

concerning the dispute that the CRA received from the consumer.  *See* 15 U.S.C. § 1681i(a)(2).  The

furnisher must then conduct a reasonable investigation of the disputed account based upon the disputed

information provided by the CRA and the consumer.  *See* 15 U.S.C. § 1681s-2(b).

Here, SSA maintains, Robinson disputed the SSA account with Equifax.  Equifax sent a CDV

to SSA requesting that it investigate Robinson's dispute.  According to SSA, once it received that

CDV, it owed a duty to conduct a reasonable investigation.[15]  If its investigation had uncovered

---

[14] SSA contends that a consumer who merely disputes the account information with the
furnisher, but not the CRA, cannot bring a claim under the FCRA.  *See* 15 U.S.C. § 1681i (discussing
procedures in cases of disputed accuracy of credit reports); *Dornhecker v. Ameritech Corp.,* 99
F.Supp.2d 918, 928-29 (N.D. Ill. 2000).  The court in *Dornhecker* stated:

> Nevertheless, Sanchez's FCRA pleadings are otherwise insufficient. As noted earlier,
> Section 1681s-2(b) triggers a furnisher's duty to investigate allegedly erroneous
> information when that furnisher has received notice from a consumer reporting agency
> that the credit information is disputed. Nowhere does Sanchez make such an allegation;
> instead he alleges that he notified Ameritech of the dispute. For that reason, Sanchez's
> FCRA claim is dismissed without prejudice, and therefore the court also dismisses his
> pendent state law claims.

99 F.Supp.2d at 928-29.

[15] SSA asserts that whether it violated the FCRA by reporting the account in the first instance is
not the subject of this lawsuit.  According to SSA, the FCRA provides no private right of action for
consumers who allege that the furnisher of credit information negligently or willfully reported inaccurate
credit information.  *See* 15 U.S.C. § 1681s-2(a) (discussing duty of furnishers to provide accurate

inaccuracies, SSA asserts, then it was required by the FCRA to correct or discontinue reporting the inaccurate information.

Given the cursory notice Robinson provided Equifax and SSA concerning the reason for her dispute, SSA argues that it conducted a reasonable investigation by endeavoring to verify the information provided on the CDV against the credit application, personal guarantee, and other documents in the company's computer and physical files. *See, e.g., Malm v. Household Bank (SB), N.A.,* No. Civ. 03-4340ADMAJB, 2004 WL 1559370 (D. Minn. July 7, 2004) (finding furnisher's "investigation under § 1681s-2(b) was reasonable given the cursory notice it received concerning Plaintiff's dispute"); *Westra v. Trans Union LLC,* No. 03 C 1181, 2004 WL 1794482 (N.D. Ill. August 05, 2004) (finding investigation reasonable when furnisher checked identification information upon plaintiff's report that account did not belong to plaintiff); *Schmit v. Trans Union LLC,* No. 03 C 1643, 2004 WL 785098 (N.D. Ill. April 12, 2004) (granting summary judgment in favor of furnisher). SSA asserts that the CDV, which was generated by Equifax based upon Robinson's Research Request Form, simply stated "Not his/hers.  Provide complete ID."  SSA contends that the CDV did not specify that the personal guarantee had been forged.  Nor, SSA argues, did it mention the possibility of identity theft or fraud.

According to SSA, the standard of care applied to determine whether a reasonable

---

information); *Riley v. General Motors Acceptance Corp.*, 226 F.Supp.2d 1316, 1319 (S.D. Ala. 2002) (stating "[t]here is no private cause of action under 15 U.S.C. § 1681s-2(a)").  SSA contends that it is only after the furnisher receives a CDV from the CRA that a private right of action may arise if the furnisher fails to reasonably investigate the dispute.  SSA concludes that Robinson's FCRA claims are limited, therefore, to events occurring after SSA received the CDV.

investigation was conducted is the "reasonably prudent person " standard.  *Davis v. Equifax Information Services LLC,* 346 F.Supp.2d 1164, (N.D. Ala. 2004).  *See also Kronstedt v. Equifax,* No. 01-C-0052-C, 2001 WL 34124783 (W.D. Wis. December 14, 2001) (citing *Bruce v. First U.S.A. Bank*, 103 F.Supp.2d 1135, 1143 (E.D. Mo.2000) for the proposition that "§ 1681s-2(b)'s investigation requirement for entities furnishing credit information is analogous to the reinvestigation requirement imposed upon credit reporting agencies under § 1681i(a), which courts have interpreted as imposing a duty to conduct a reasonable reinvestigation").  It is SSA's position that it acted in a reasonable prudent manner in light of the very limited and cryptic information provided by Robinson.

SSA draws the court's attention to *Malm v. Household Bank (SB), N.A.,* No. Civ. 03-4340ADMAJB, 2004 WL 1559370 (D. Minn. July 7, 2004), in which the plaintiff discovered after his divorce that, while still married, his ex-wife had opened a Best Buy credit card account in both their names.  2004 WL 1559370.  Malm had not consented to or been aware of the account.  *Id.*  He did not learn about the account until a credit application was rejected sometime after his divorce.  *Id.*  His ex-wife failed to make payments on the Best Buy account, and it appeared on his credit report as delinquent.  *Id.*

Malm disputed the account with Trans Union by submitting a Request for Investigation Form. *Id.*  Trans Union, in turn, sent a CDV to the furnisher.  *Id.*  Like the CDV that was sent by Equifax to it concerning Robinson's account, SSA argues, the Trans Union CDV stated, "Not his/hers.  Provide complete ID" in the "Consumer States/Comments" section.  *Id.*  Further, SSA argues, as it did in the present case, the furnisher in *Malm* researched its files and confirmed that the account was Malm's.  *Id.*

16

SSA notes that the *Malm* court granted summary judgment in favor of the furnisher, rejecting Malm's claim that the furnisher did not comply with the FCRA's requirements for investigating disputed accounts. *Id.* The *Malm* court recognized that a furnisher's duty to reasonably investigate a dispute does not arise unless and until it receives proper notice from a CRA. *Id.* The court stated that before it could determine whether the furnisher had reasonably investigated the dispute, it had to decide whether the furnisher had received sufficient notice of the dispute from Trans Union. *Id.*

Looking at the issue of notice, the *Malm* court stated:

> The CDV form does not specify that Plaintiff believed the account belonged to his ex-wife only, or that she forged his signature to open it. . . . [The furnisher] Sherman's investigation under § 1681s-2(b) was reasonable given the cursory notice it received concerning Plaintiff's dispute. Following the instructions on the CDV form, Sherman verified that Plaintiff's personal information matched its records, and updated the account balance. Sherman apparently did not review the actual application. The cryptic "Not his/hers" did not notify Sherman that additional inquiry was necessary. While specific notice of Plaintiff's concerns could have compelled Sherman to conduct a more thorough review, thus creating an issue of "reasonableness" for the jury, a more rigorous investigation was not required here based on the superficial notice that Trans Union provided

*Id.* (citation to record omitted).

SSA next highlights *Westra v. Trans Union LLC,* No. 03 C 1181, 2004 WL 1794482 (N.D. Ill. August 05, 2004), in which the plaintiff discovered that a former friend had fraudulently opened several credit accounts in his name. 2004 WL 1794482, at *1. One such account was reported by Trans Union. *Id.* Westra mailed a dispute letter to Trans Union, enclosing a fraud statement as well as personal information about the former friend. *Id.* From the letter and fraud statement, Trans Union generated a CDV and sent it to the furnisher of the credit information. *Id.* However, Trans Union did not mention in the CDV that Westra had been the victim of identity theft. *Id.* The CDV simply stated

that the account did not belong to Westra.  *Id.* at *2.  The furnisher verified the name, address and date of birth on the account and returned the CDV to Trans Union, confirming that the account did belong to Westra.  *Id.*

When Westra learned that the account had not been removed from his credit report, he wrote another letter to Trans Union, again including a fraud statement, and also sent a letter directly to the furnisher, indicating that the account did not belong to him and that he had been the victim of identity theft.  *Id.* at *1.  After this, Trans Union again contacted the furnisher regarding the account and included a notation that the account was disputed as being fraudulent.  *Id.*  After receiving this information, the furnisher deleted the account status from its reports to Trans Union.  *Id.*

SSA notes that the *Westra* court stated that, "[w]hile the reasonableness of [a furnisher's investigation] is generally a question of fact reserved for the jury, summary judgment is proper if the reasonableness is beyond question."  *Id.* (citing *Crabill v. Trans Union*, 259 F.3d 662, 664 (7th Cir. 2001).  The *Westra* court granted summary judgment in favor of the furnisher, holding that the furnisher had conducted a reasonable investigation after receiving both the first and the second CDV from Trans Union.  *Id.* at *2.  The court stated as follows:

> The initial CDV received by Credit Control[, the furnisher,] indicated plaintiff was disputing the account, claiming that it did not belong to him. Credit Control verified the name, address and date of birth on the [] account and returned the CDV to Trans Union. By providing Trans Union with the information relating to the account, defendant here did more that simply "parrot back" the information provided by Trans Union-it conducted a reasonable investigation. Certain circumstances may require a reporter to more thoroughly investigate the source of information. *Kronstedt v. Equifax*, 2001 WL 34124783, *7 (W.D.Wis.) Here, however, there was no information on the CDV alerting Credit Control to the possibility that the source was unreliable nor is there anything otherwise indicating that Credit Control knew or should have known that the source was unreliable. *Id*. The amount involved was minor, $281, dating back almost

18

three years. Perhaps the consumer had forgotten or was unaware of it . . . or was ducking. A furnisher of information need not contact the subject during every investigation, nor must it treat every dispute as possible identity theft.

*Id.*[16]

Finally, SSA draws the courts attention to *Schmit v. Trans Union LLC,* No. 03 C 1643, 2004 WL 785098 (N.D. Ill. April 12, 2004).  In *Schmit*, the plaintiff disputed Trans Union's reporting of a delinquent automobile loan by sending a letter to Trans Union along with a copy of the fraud judgment she had received against the automobile dealership that had agreed to pay off the loan during a trade-in transaction.  2004 WL 785098, at *1.  Trans Union sent a CDV to the furnisher of the credit information, which was a different lender that had purchased the loan from the original dealership.  *Id.* However, the CDV information was confirmed, and the information continued to be reported.  *Id.*  In granting the furnisher's motion for summary judgment, the *Schmit* court stated:

> [P]laintiff asserts that Trans Union sent Key Bank[, the furnisher,] a Consumer Dispute

---

[16] SSA notes that the Seventh Circuit recently affirmed the holding and rationale in *Westra*. *Westra v. Credit Control of Pinellas,* 409 F.3d 825  (7th Cir. 2005).  The Seventh Circuit found:

> [The furnisher] Credit Control's investigation in this case was reasonable given the scant information it received regarding the nature of Westra's dispute. Credit Control received a CDV from Trans Union indicating that Westra was disputing the charge on the basis that the account did not belong to him. The CDV did not provide any information about possible fraud or identity theft or include any of the documentation provided to Trans Union by Westra. Credit Control verified Westra's name, address, and date of birth and sent the CDV back to Trans Union. Had Trans Union given Credit Control notice that the nature of the dispute concerned fraud, then perhaps a more thorough investigation would have been warranted. Given the facts of this case, however, Credit Control's verification of Westra's information was a reasonable procedure.

409 F.3d at 827.

Verification form in early January, 2003. . . . But what did Key Bank know in January? It only knew that Schmit stated the information was inaccurate but "Did not provide specific dispute," and that the account had not been paid. If it knew what Trans Union knew, that plaintiff had a judgment against Faul Chevrolet, which was supposed to pay off the loan but had not been collected (which Trans Union could itself have indicated on its report), perhaps it would have had an obligation to flag that as the reason plaintiff had not paid, although that did not erase the debt. But it did not know, or at least there is no evidence that it knew. We believe, in those circumstances, that reasonable investigation extended no further than an internal review.

*Id*. at *4.

SSA concludes that *Westra*, *Malm*, and *Schmit* demonstrate that the determination of whether a furnisher's investigation of a consumer dispute was reasonable depends entirely on the notice it was given concerning the nature of the dispute. More specifically, SSA argues, these cases show that, in the instant case, SSA had no way of knowing that Robinson's signature was a forgery until after discovery was commenced.[17]  Similar to the furnisher in *Schmit*, SSA contends, at the time it conducted its investigation in December 2003 and April 2004, the company knew only that Robinson said the account was not hers. Further, SSA asserts, as in *Westra*, here the amount involved was minor, around $400, and the debt was roughly two years old.[18]

---

[17] SSA highlights Robinson's following testimony:

> Q:    From the information that you provided them, Speedway had no way of knowing that you were alleging that your signature was forged on the personal guaranty, right? . . .
> A:    They would not have known.

(Robinson Depo., p. 104).

[18] SSA points the court's attention to O'Hara's following testimony:

> A:    . . . I guess this one was noted not his or hers, please provide ID.  There was no indication that the consumer was disputing that there was fraud on the

Moreover, SSA continues, in *Westra*, *Malm*, and *Schmit*, the furnisher had been provided a cryptic and superficial explanation of the dispute, which was held to be insufficient to trigger a more thorough investigation.  SSA argues that the same is true in this case.  According to SSA, Robinson provided nothing but the most superficial explanation regarding her dispute, and SSA's investigation was reasonable under the circumstances.[19]

SSA maintains that the FCRA does not require that a furnisher contact a consumer directly as part of a reasonable investigation.  *See Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (stating, "requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA").  Yet, SSA argues, before the account was converted to a personal account in Robinson's name, SSA contacted her directly to let her know that the company planned to rely upon the personal guarantee.  SSA points out that Robinson admitted that she was so informed, but she did nothing to correct the situation.  Moreover, SSA continues, Robinson failed to notify Equifax and SSA that Robinson's signature had been forged on the Guarantee when she submitted requests for investigations in December 2003 and April 2004.  Further,

---

account.  You know, my history shows that when it says not his or hers, a majority of the time it's a consumer that has forgotten that the account was even opened, and usually it's an old account that they have forgotten about.  That does not indicate to us that there is necessarily fraud involved.

(O'Hara Depo., pp. 98-99).

[19] SSA notes that Robinson failed to utilize 15 U.S.C. § 1681c-2, which requires a CRA to block the reporting of information that a consumer identifies as resulting from identity theft.  The statute requires that the consumer send the CRA a copy of an identity theft report, a statement, and proof of identity.  Further SSA argues, Robinson failed to take advantage of Equifax's offer to publish on her credit report a personally written statement explaining the dispute regarding SSA's account.

21

SSA notes, Robinson's complaint does not indicate that her signature was forged.

**B.      SSA Was Not Negligent.**

     **1.      This Is Not a Case of Imposter Fraud.  Before Any Action Was Taken that Would Adversely Affect Plaintiff's Credit History, She Was Notified by SSA that It Intended to Act on the Personal Guarantee.**

SSA notes that plaintiff has asserted a state law claim against it for negligently opening an account for, and issuing credit cards to, an imposter.  According to SSA, this claim generally is known as negligent enablement of imposter fraud.  Conventionally, SSA maintains, the cases dealing with this claim involve a bank or creditor opening an account for an imposter using stolen personal identification information.  SSA contends that a number of states have refused to recognize such a cause of action, relying on the rule that one does not owe a duty to protect another from the criminal acts of a third party, absent a special relationship.  *See Smith v. Citibank (South Dakota), N.A.,* No. 00-0587-CV-W-1-ECF, 2001 WL 34079057, at *2-3 (W.D. Mo. October 3, 2001) (finding credit card issuer owed no duty to victim of imposter fraud, a non-customer); *Huggins v. Citibank, N.A.*, 585 S.E.2d 275, 277 (S.C. 2003) (finding that foreseeability alone does not give rise to duty, and holding that credit card issuers have no duty of care to protect potential victims of identity theft because there is no special relationship); *Polzer v. TRW, Inc.,* 256 A.D.2d 248, 248 (N.Y. App. Div. 1998) (holding that credit card issuer had no special relationship with either imposter or victim and, therefore, no duty was owed).

According to SSA, Alabama courts have long applied the rule that, "absent a special relationship or special circumstances, a person has no duty to protect another from criminal acts of a third person." *Patrick v. Union State Bank,* 681 So.2d 1364, 1367 (Ala. 1996).  Nevertheless,

SSA acknowledges, in *Patrick*, the Alabama Supreme Court recognized a claim for negligent enablement of imposter fraud. *Id.* at 1371. However, SSA maintains, *Patrick* is distinguishable from the facts here. SSA argues that *Patrick* questioned the actions of a bank under conventional imposter fraud circumstances. In *Patrick*, an imposter opened an account in the plaintiff's name and was issued checks, allowing the imposter to write several bad checks. *Id.* at 1365. As a result of the imposter's actions, the plaintiff was arrested and incarcerated for several days. *Id.* at 1366. Under those facts, the *Patrick* court held that "a bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter." *Id.* at 1371. SSA argues that the facts here are different.[20]

In the present case, SSA asserts, there were no typical fraud circumstances, and the parties were not involved in a banking relationship.[21] Further SSA contends, an imposter did not open an

_____

[20] According to SSA *Patrick* is the only Alabama case imposing such a duty. SSA maintains that the only other Alabama case dealing with negligent enablement of imposter fraud is *Smith v. AmSouth Bank, Inc.*, 892 So.2d 905 (Ala. 2004). In *Smith*, the court refused to impose a duty on the defendant, and stated "[t]he circumstances in *Patrick* were particularly egregious, and *Patrick* is distinguishable from this case." 892 So.2d at 912.

[21] SSA argues that the fact that the defendant was a bank was significant to the court's holding in *Patrick*. The court stated:

> In a case upholding legislative regulation of the banking industry, this Court noted, generally:
>> "Banks stand in the intimate relation of a fiduciary to those who are their customers, depositors, stockholders, and associate banks, as well as the public generally, whose members are affected by their operation. Ordinary corporations handle their own money, but banks handle the money of other individuals. They are quasi-public corporations by nature, subject to regulation and supervision by the state."
>
> *Security Trust & Savings Bank v. Marion County Banking Co.*, 287 Ala. 507, 513, 253 So.2d 17, 21 (1971). Of course, banks do not actually have a legal fiduciary duty

account in Robinson's name.  Instead, the account was in the name of Lethal's Landscaping, and Dunn was the only signatory on the account.  Moreover, SSA argues, credit charges were never made in Robinson's name.  Unlike the circumstances in *Patrick*, SSA observes, here nothing was done to adversely affect Robinson's credit rating until after she was put on notice that SSA had a personal guarantee that purportedly bore her signature.  In *Patrick*, SSA notes, several checks were written by an imposter in the plaintiff's name, and the plaintiff knew nothing about the fraud until she was notified about a warrant for her arrest for issuing worthless checks.  681 So.2d at 1365-66.  Here, SSA states, before it took any action that might have impacted Robinson, she was notified about the personal guarantee.  Yet, SSA asserts, even though Robinson was advised that the SSA account would be placed in her name and that her credit history would be affected, she did nothing for nearly a year.

SSA argues that, in *Smith v. AmSouth Bank, Inc*., 892 So.2d 905 (Ala. 2004), the Alabama Supreme Court clarified its position on the question of foreseeability in imposter fraud situations.  In *Smith*, the court stated:

> Additionally, and most importantly to this case, the question of foreseeability is answered by viewing events from the perspective of the defendant charged with

---

to the public at large, see *Bank of Red Bay v. King*, 482 So.2d 274 (Ala.1985) (noting that special circumstances are necessary to impose on a bank a fiduciary duty to disclose, because the relationship between a bank and its customer has been traditionally viewed as merely a creditor-debtor relationship), but the quotation from *Security Trust* illustrates the importance of, and the public trust placed in, the banking industry. Thus, the nature of the activity of a bank, such as Union State Bank, is such that some duty to the public in the exercise of the bank's business may be justifiably imposed.

681 So.2d at 1369.  As it is not a bank, SSA argues, it does not holed the same fiduciary-like position in relation to the public.

negligence, in this case, AmSouth. *Hanna v. Riggs*, 333 So.2d 563, 567 (Ala.1976).

> In *Patrick*, the resolution of the issue of foreseeability was unclear. We concluded that "[t]he issuance of worthless checks is extremely likely to result from opening a checking account for, and giving checks to, an imposter." 681 So.2d at 1369. Rather than approaching the inquiry from the perspective of the defendant bank, this Court in *Patrick* appears to have approached the foreseeability inquiry from the perspective of the impostor. Without addressing whether the conclusion in *Patrick* was appropriate, we note that a properly framed question would ask whether it was foreseeable that the opening of the checking account under the particular circumstances would lead to criminal activity, perhaps the passing of worthless checks. The correct question may have still yielded an affirmative answer, but our inquiry in *Patrick* was not properly focused.

892 So.2d at 910-11.  Therefore, SSA concludes, the question in the instant case should be whether it was foreseeable to SSA that, in agreeing to open a commercial account in the name of Lethal's Landscaping, Dunn would forge Robinson's name on the personal guarantee.

SSA maintains that foreseeability depends on the facts and circumstances known to the defendant at the time of the events in question.  *See Ex parte Wild Wild West Social Club, Inc.*, 806 So.2d 1235, 1239-41 (Ala. 2001) (stating that foreseeability "depends upon the facts and circumstances of each case").  Here, SSA asserts, it knew that Robinson was a corporate officer of Lethal's Landscaping.  SSA notes that it received the signed personal guarantee after writing Robinson at the company's address.  Further, Robinson's purported signature was witnessed by Dunn and another company officer.  According to SSA, there was nothing that occurred during the application process that gave, or should have given, SSA any reason to suspect any impropriety.[22]

---

[22] SSA contends that the facts here differ from those in *Patrick*, where the bank was held to have had "actual notice" of a discrepancy between the imposter signature and the victim's stolen driver's license.  681 So.2d at 1370.

### 2.    Plaintiff Was Contributorily Negligent.

It is SSA's position that Robinson's own negligence bars any claims she may have against it.

SSA asserts that, although it was not foreseeable to it that Dunn would forge Robinson's signature on

the personal guarantee, it was foreseeable to Robinson.  According to SSA, Robinson's decision to

provide Dunn with all the information he needed to use her identity, as well as her inaction once she was

aware that he was doing so improperly, facilitated Dunn's fraud.  SSA highlights Robinson's following

testimony:

> Q:    Did your foresee that Mr. Dunn might have forged your signature to anything
>       while you were dating him?
> A:    Did I foresee him doing it?
> Q:    Yes.
> A:    Possibly.
> Q:    It's possible?
> A:    Yes.
> Q:    Why?
> A:    Because he opened up an American Express [account].
> . . .
> Q:    What do you mean?  In your name?
> A:    Yes. With the landscaping.
> Q:    He opened an American Express card?
> A:    Uh-huh.
> Q:    In the name of Lethal's Landscaping?
> A:    Yes.
> Q:    And how did he use your name on that?
> A:    He put me down as the guarantor.
> Q:    And you knew about that?
> A:    Uh-huh.
> Q:    When did he do that?
> . . .
> A:    2001. 2002.
> Q:    So was that before or after you got the letter from Speedway November 7th,
>       2002?
> A:    Before.
> Q:    How did you find out about the American Express account?

A:     A phone call from them.

Q:     What did they say?

A:     That my account was delinquent.

Q:     Did they ask you to pay it?

A:     Yes.

Q:     Did you pay it?

A:     I went to him [Dunn] and he said he was going to pay it.

Q:     Did he do that?

A:     No.  He didn't.

Q:     What happened then?

A:     I paid it.

. . .

Q:     . . . We were talking about the American Express account you told me that Mr. Dunn had . . . forged your name to a personal guaranty on that account?

A:     Yes.

Q:     Did you have a copy of that personal guaranty?

A:     No.

Q:     Was that something that you were told that they had a personal guaranty with your name on it?

A:     Yes.

. . .

Q:     Did you aks for a copy of that personal guaranty?

A:     No.

Q:     How did you know that he forged your name to that?

A:     I didn't open it.

Q:     Did you talk to Mr. Dunn about that?

A:     Yes.

. . .

Q:     What did he say about your signature bing on the personal guaranty?

A:     he — I don't — he said — he said he did it.

. . .

Q:     Did you get angry with him that he had signed your name?

A:     Yes.

Q:     Did you go to the police about it?

A:     No.

Q:     Where you still dating him at the time?

A:     Yes.

Q:     Did you continue to date him?

A:     Yes.

. . .

Q:     Did you explain to American Express what happened?

A:      Yes.

Q:      Did you send them anything proving that it was not your signature?

A:      No.

Q:      Did you explain over the phone to someone —

A:      Yes.

Q:      — what happened with that account?

A:      Yes.

Q:      Was that after you talked to Mr. Dunn?

A:      It's before.  I think before and after I talked with several people.

. . .

Q:      Is there any other account that Mr. Dunn opened and signed your name to?

A:      There was a Staples [account].

Q:      When was that?  Before or after November 7th, 2002?

A:      I think before.

. . .

Q:      So you had some idea that Mr. Dunn might forge your signature again because he had already done it twice?

A:      Possible, yes.

Q:      Do you have any documents or any evidence, any information that would lead you to believe that Speedway would foresee that he might be forging your signature?

. . .

A:      No.

Q:      Well, especially if you know Speedway knew that you were an officer of Lethal's Landscaping, you were the treasurer, you were listed as the treasurer, right?

A:      Yes.

(Robinson Depo., pp. 143-51).  SSA points out that, knowing what she did, Robinson: (1) did not

share this with the credit reporting agencies or put an alert on her credit reports; (2) did not file any kind

of charges against Dunn; (3) continued to date Dunn; and (4) remained treasurer of Lethal's

Landscaping.  Moreover, SSA contends, when she was told about the personal guarantee SSA had on

file, Robinson did nothing to protect herself.  Thus, SSA concludes, Robinson facilitated Dunn's

criminal activity, and ignored opportunities to shield herself from the consequences of those activities.

SSA notes that "[c]ontributory negligence is an affirmative and complete defense to a claim

28

based on negligence." *Ridgeway v. CSX Transp., Inc*., 723 So.2d 600, 606 (Ala. 1998).  To

establish contributory negligence, a defendant must prove that the plaintiff: "1) had knowledge of the

dangerous condition; 2) had an appreciation of the danger under the surrounding circumstances; and 3)

failed to exercise reasonable care, by placing himself in the way of danger." *Id.*  SSA states that

Robinson knew that Dunn had forged her signature before and expected that he might do it again.

Moreover, SSA argues, because she had already paid his debts with American Express and Staples,

Robinson appreciated the harm that would result if Dunn forged her signature again.  Nevertheless,

SSA asserts, Robinson did nothing to put a stop to Dunn's fraud or to protect herself from his conduct

when given the chance.

### C.     Plaintiff Has No Evidence to Support Her Defamation Claim.

SSA notes that, in Count Three, Robinson claims that SSA defamed her by publishing, with

malice, the delinquency of the SSA account to collection agencies and/or attorneys.[23]  It is SSA's

position that Robinson can prove neither publication nor malice and, therefore, summary judgment in

SSA's favor is proper on this claim.

SSA maintains that "[t]o establish a prima facie case of defamation under Alabama law, a

plaintiff must show that the defendant published a false and defamatory statement concerning the

plaintiff to a third person." *Moore v. Beneficial Nat. Bank USA*, 876 F.Supp. 1247, 1257 (M.D.

Ala. 1995).  SSA draws the court's attention to Robinson's following testimony:

---

[23] SSA points out that this court has narrowed this count, dismissing any claims where the publication of this information was directed through reporting to CRAs, based upon FCRA preemption provisions.  According to SSA, only publication directly to collection agencies and/or attorneys is at issue.

> Q:    You are claiming that Speedway told certain other people besides you about this account being on your credit report.  Who else do you claim Speedway told?
>
> A:    Because besides the credit report people, I don't know.
>
> Q:    So your testimony is that you don't have any information that they told anyone else?
>
> A:    No.
>
> Q:    What about collection agencies?
>
> A:    Yes.  Collection agencies I would imagine would be part of Speedway.
>
> Q:    Can you identify any collection agency that they may have told?
>
> A:    No.
>
> Q:    Can you identify anyone else at all that Speedway has told anything about this account being on your credit report?
>
> A:    No.

(Robinson Depo, pp. 154-55).  Given this testimony, SSA concludes, other than CRAs, Robinson has no evidence to demonstrate that SSA communicated with anyone about the delinquent account.

According to SSA, even if Robinson's allegations are accepted as true, collection agencies and attorneys were the only entities she alleges were told of the delinquent account.  SSA argues that providing information to one's employees or agents in the course of business is not "publication" to third parties for purposes of establishing a defamation claim.  *Brackin v. Trimmier Law Firm,* 897 So.2d 207, 222 (Ala. 2004) (finding no publication where agents of defendant company, while acting withing the scope of their duties and in the course of transacting legitimate business, shared allegedly defamatory information with attorneys and an outside auditor retained by the attorneys).  Therefore, SSA concludes, any such communication that might have taken place would not constitute publication as a matter of law.  As there is no publication, SSA asserts, it is unnecessary to consider the other elements of defamation or whether SSA acted with malice.  *See id.* (stating, "if there is no publication to a third party, there can be no defamation and there is no need to consider malice, privilege, or any of

30

the other elements of defamation").[24]

####    D.    Plaintiff Has No Evidence to Support Her Wantonness and Willfulness Claims.

SSA points out that Robinson alleges that SSA wantonly accepted the personal guarantee with the forged signature, and acted willfully in violated the FCRA.  According to SSA, Robinson's own testimony proves otherwise:

> Q:    You stated in your complaint that Speedway acted willfully to coerce you to pay the account.  Can you explain that to me?
>
> A:    Well, the guy who I talked with told me that he would do whatever it took to get the payment.
>
> Q:    Is that all he told you?
>
> A:    Yes.  That's all he told me.
>
> Q:    Is there anything else that you base this claim that they tried to coerce you to pay?
>
> A:    When the second guy called to make some type of agreement.  Settlement agreement.
>
> Q:    How did he try to coerce you?
>
> A:    Well, he didn't coerce me.
>
> Q:    Okay.

--------

[24] SSA maintains that Robinson has no evidence to support her contention that SSA acted with malice.  The company points to Robinson's following testimony:

> Q:    Do you have any information at all that Speedway had any ill-will towards you —
>
> A:    No.
>
> Q:    — with regard to the account?
>
> A:    No.

(Robinson Depo., pp. 157).  SSA notes that malice may be shown "'by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of publication, and the like.'"  *Brackin,* 897 So.2d at 224 (citing *Kenney v. Gurley*, 95 So. 34, 37 (1923)).  According to SSA, it may also be shown by proof of "recklessness of the publication and prior information regarding its falsity."  *Wiggins v. Mallard*, No. 1030937, 2004 WL 2367838, at *7 (Ala. October 22, 2004) (internal quotation marks and citation omitted).

A:      He just stated that they would be willing to take a certain sum.

. . .

Q:      In your complaint you stated that Speedway had obstructed the investigation into your dispute of the Speedway account.  Can you explain that to me?

A:      No.

Q:      Do you have any information that Speedway obstructed the investigation into that Speedway account?

A:      No.

Q:      Another claim that you have in your complaint is that Speedway was negligent in opening the account and was wanton.  I don't know if you know what wanton means or not.  But what you have alleged is that they were wanton in opening the account.  Do you have any information that Speedway consciously or intentionally, knowingly took that personal guarant[ee] knowing that your name was forged with a reckless indifference to what was going to happen when they took that and opened the account?

A:      No.

Q:      Do you have any information at all that Speedway had any ill-will towards you —

A:      No.

Q:      — with regard to the account?

A:      No.

(Robinson Depo, pp. 155-57).

SSA states that wantonness has been defined under the Alabama Code as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others."  Ala. Code § 6-11-20(b)(3) (1975).  SSA highlights the following passage from *Ammons ex rel. Wausau Insurance Co. v. Tesker Manufacturing Corp.*, 853 So.2d 210 (Ala. 2002):

> "Wantonness involves the '*conscious* doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'" *Id.* (quoting *Alfa Mut. Ins. Co. v. Roush*, 723 So.2d 1250, 1256 (Ala.1998)) (emphasis added in *Scoggins* ). Thus, "[t]he 'knowledge' of the defendant is 'the sine qua non of wantonness.'" *Norris v. City of Montgomery*, 821 So.2d 149, 156 n. 9 (Ala.2001) (quoting *Ricketts v. Norfolk Southern Ry.*, 686 So.2d 1100, 1106 (Ala.1996)).

853 So.2d at 213.  According to SSA, the evidence shows that it had no knowledge, and no way of

32

knowing, that Robinson's signature was forged.  Therefore, SSA concludes, it is entitled to summary judgment on that claim.

SSA maintains that it is also entitled to summary judgment on Robinson's claim that it willfully violated the FCRA.[25]  According to SSA, willful noncompliance with the FCRA, like wantonness, has been defined as "'knowingly and intentionally committ[ing] an act in conscious disregard for the rights of others.'"  *Stevenson v. TRW Inc*., 987 F.2d 288, 293 (5th Cir. 1993) (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.1986)).  In *Stevenson*, SSA notes, the court found that, alone, a delayed investigation and negligence in promptly removing inaccurate information did not constitute willfulness.  987 F.2d at 294 (finding no "intention to thwart consciously Stevenson's right to have inaccurate information removed promptly from his report").  Likewise, SSA argues, there is no evidence in this case that it intended to consciously thwart Robinson's right to have inaccurate information removed from her credit report.  SSA draws the court's attention to the following passage from *Reed v. Experian Information Solutions, Inc.,* 321 F.Supp.2d 1109 (D. Minn. 2004):

> Courts have generally found willful violations in cases where CRAs have intentionally misled consumers or concealed information from them. *See Cousin v. Trans Union Corp*., 246 F.3d 359, 372 (5th Cir.2001). That is not the case here. Moreover, the failure to delete erroneous information after receipt of notice by the consumer and even the reinsertion of incorrect information after it had previously been deleted have been found to fall short of the knowing and intentional disregard standard. See *Philbin* [ *v. Trans Union Corp.*], 101 F.3d [957,] 970 [(3rd Cir. 1996)]; *Casella*[ *v. Equifax Credit Information Svcs*.], 56 F.3d [469,] 476 [(2nd Cir. 1995)].

---

[25] SSA asserts that the FCRA has two damages provisions.  According to SSA, the first allows for actual damages and attorney's fees where a person or entity has negligently violated the FCRA provisions.  15 U.S.C. § 1681o.  SSA states that the other provides for statutory damages, punitive damages, and attorney's fees where a person or entity has willfully violated the FCRA provisions.  15 U.S.C. § 1681n.

321 F.Supp.2d at 1116 (granting summary judgment on plaintiff's claim that defendants willfully

violated FCRA).  SSA contends that there is no evidence in this case that it intentionally mislead

Robinson or concealed information from her.

As to the issue of punitive damages, SSA argues, "[o]nly defendants who engaged in 'willful

misrepresentations or concealments' have committed a willful violation and are subject to punitive

damages under § 1681n."  *Stevenson*, 987 F.2d at 294 (citation omitted).  SSA maintains that, as

there is no evidence of such conduct here, Robinson is not entitled to punitive damages.

### E.    Plaintiff Has No Evidence to Support Her Claim for Mental Anguish Damages.

SSA disputes Robinson's allegations that she has endured mental anguish because of its

conduct.  SSA points to Robinson's following testimony:

> Q:    You have alleged mental anguish in this [suit], right?
> A:    Yes.
> Q:    Have you sought any medical treatment?
> A:    No.
> Q:    Have you sought any psychological treatment?
> A:    No.
> Q:    Do you have any information or documents that you can provide us that shows
>       you have suffered any kind of mental anguish?
> A:    No.
> Q:    What does that mean to you that you have suffered mental anguish?
> A:    I guess just agonizing over the outcome of all of this.  Not knowing what to
>       expect.  Sitting down and answering these questions.  Putting my life out there
>       in the open for everybody to see.
> Q:    Do you contend that this has affected you physically in any way?
> A:    Physically meaning?
> Q:    Any physical symptoms.
> A:    No.

(Robinson Depo, pp. 141-42).  SSA contends that, while the FCRA may allow for mental anguish

damages for embarrassment and humiliation related to the rejection of a credit application,

embarrassment as the result of filing a lawsuit is not the sort of mental distress contemplated by the

statute.  *See Trikas v. Universal Card Services Corp*., 351 F.Supp.2d 37, 45 (E.D. N.Y. 2005)

(citing  *Casella*, 56 F.3d at 474-75 for the proposition that "claiming private mental distress, without

any showing that a creditor or other third party saw the erroneous information or took any negative

action towards the allegedly aggrieved party because of it, is not enough for pain and suffering

damages").  SSA concludes that Robinson has failed to show any emotional distress resulting from or

caused by inaccuracies published in her credit report.

SSA maintains that Robinson "is required to show some objective physical manifestation of the

distress she suffered" in order to collect damages for mental anguish.  *Thomas v. Gulf Coast Credit*

*Services, Inc.,* 214 F.Supp.2d 1228, 1235 (M.D. Ala. 2002) (citing *Jones v. CSX Transp*., 287 F.3d

1341, 1348 (11th Cir. 2002)).  SSA contends that she has no objective evidence.  Moreover, SSA

argues,

> [i]n federal causes of action, claims of emotional distress generally "must be supported
> by evidence of a genuine injury, such as evidence of the injured party's conduct and the
> observations of others." *See Cousin v. Trans Union*, 246 F.3d 359, 371 (5th
> Cir.2001) (citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252
> (1978)). The Fifth Circuit reached the same conclusion regarding emotional distress
> claims in discrimination cases. *See id.* (citing *Patterson v. P.H.P. Healthcare Corp*.,
> 90 F.3d 927, 938 (5th Cir.1996)). The Eighth Circuit Court of Appeals has held that
> emotional distress claims "must be supported by competent evidence of genuine injury."
> *Forshee v. Waterloo Indus., Inc*., 178 F.3d 527, 531 (8th Cir.1999) (considering
> viability of emotional distress claims in the context of Title VII).

*Reed v. Experian Information Solutions, Inc*., 321 F.Supp.2d 1109, 1115 (D. Minn. 2004).  SSA

notes that, in *Reed*, the plaintiff's evidence consisted of "his vague testimony that 'it's not a good

feeling,' that he is 'emotional' and 'pissed about the whole thing.'"  *Id.*  The *Reed* court held that this

evidence did not present a genuine injury, and granted summary judgment to the defendants on

plaintiff's severe emotional distress claim. *Id.* at 1115-16. Likewise, SSA concludes, Robinson's

vague testimony that she has agonized over the outcome of this lawsuit is not sufficient to save the claim

from summary judgment.

### F.      Plaintiff's Claims Are Barred by the Doctrine of Equitable Estoppel.

SSA asserts that, despite having crucial knowledge of facts regarding the alleged forgery on the

SSA account, Robinson did not share her knowledge with SSA. SSA notes that Dunn told Robinson

that he had forged her name and used her personal identification information without her knowledge

twice to open credit accounts with American Express and Staples. SSA maintains that Robinson did

nothing to alert creditors or to stop Dunn from using her identity again. Further, SSA argues, it

contacted Robinson directly, and twice received dispute information from Robinson through Equifax's

CDVs. However, during these contacts, Robinson never mentioned the possibility of fraud or forgery.

SSA states that it relied upon Robinson's silence on these issues. SSA notes that, under Alabama law,

equitable estoppel has been defined as:

> (1) knowledge of the facts by the party to be estopped; (2) intention by the party to be
> estopped that its conduct be acted upon, or such party acts so that the party asserting
> estoppel has a right to believe that the conduct is so intended; (3) ignorance by the
> party asserting estoppel of the true facts; and (4) injurious reliance by the party
> asserting estoppel on the conduct.

*Bank of Huntsville v. Witcher,* 336 So.2d 1384, 1387 (Ala. Civ. App. 1976). According to SSA,

silence can raise estoppel just as effectively as untrue words. *See Fountain Bldg. & Supply Co., Inc.*

*v. Washington*, 602 So.2d 362, 364 (Ala. 1992) (stating, "[a]n estoppel exists 'when one person by

his words, acts, conduct, or silence, induces another, on the faith thereof, to pledge his credit, incur a

liability, or part with something valuable . . .'" (citation omitted)).  SSA maintains that Robinson had

superior knowledge of the facts pertaining to the personal guarantee, but withheld that information from

SSA.  SSA contends that it had no knowledge, and no reason to know, that the personal guarantee

might have been forged.  SSA concludes that Robinson must not now be permitted to assert claims

facilitated by her own lack of disclosure.

## II.     Plaintiff's Response.

### A.     SSA Did Not Conduct a Reasonable Investigation Based Upon the Information Provided by Plaintiff, and Is Liable Under 15 U.S.C. § 1681n[26] for Negligently and/or Willfully Failing to Comply With the FCRA.

It is plaintiff's position that SSA failed to conduct a proper investigation as required by 15

U.S.C. § 1681s-2.  Plaintiff notes that SSA contends that Ridenour[27] cross-checked the information

from the CDV to that contained in SSA's records and confirmed that the account belonged to plaintiff

on December 7, 2003.  Plaintiff draws the court's attention to the opinion in *Bruce v. First U.S.A.*

---

[26] 15 U.S.C. § 1681n(a) states:

> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of–
> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
> (B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;
> (2) such amount of punitive damages as the court may allow; and
> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

[27] Plaintiff contends that Ridenour has left SSA since he performed this investigation.  Plaintiff notes that the parties have been unable to locate Ridenour or take his deposition.

37

*Bank, National Association*, 103 F.Supp.2d 1135 (E.D. Mo. 2000), which states:

> Under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq., if a consumer notifies a consumer reporting agency of a dispute regarding the completeness or accuracy of information contained in the consumer's credit report, the agency is required to reinvestigate the disputed information. 15 U.S.C. § 1681i(a). As part of its reinvestigation, the agency must notify the furnisher of the credit information of the dispute. 15 U.S.C. § 1681i(a)(2). Upon notice of a dispute from a credit reporting agency, § 1681s-2(b)(1) of the FCRA requires the furnisher of the information to conduct an investigation regarding the dispute and to report its findings accordingly

103 F.Supp.2d at 1142.

Subsection (b)(1) of 15 U.S.C. § 1681s-2 discusses the duties of furnishers of information to CRAs upon notice of a dispute.  It states:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--
> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--
> (i) modify that item of information;
> (ii) delete that item of information; or
> (iii) permanently block the reporting of that item of information.

According to plaintiff, the requirements of 15 U.S.C. § 1681s-2(b)(1)(A) to "conduct an investigation," are extensive.  Plaintiff notes that an "investigation" has been defined as a "detailed inquiry or systematic examination."  *Johnson v. MBNA America Bank, NA,* 357 F.3d 426, 430 (4th

Cir. 2004) (citing Am. Heritage Dictionary 920 (4th ed.2000)).

In *Johnson*, plaintiff points out, the plaintiff brought an action against MBNA, claiming that after she disputed the accuracy of information that MBNA was providing to credit reporting agencies, the company failed to properly investigate.  357 F.3d at 428-29.  The *Johnson* court held that § 1681s-2(b)(1)(A) requires that a furnisher conduct a reasonable investigation of their records, as opposed to a mere superficial or unreasonable inquiry.  *Id.* at 431.

Plaintiff asserts that for there to be willful non-compliance[28] with the FCRA, triggering potential punitive damages, a defendant must have knowingly and intentionally committed an action or inaction in conscious disregard for the rights of others.  *Stevenson v. TRW Inc.,* 987 F.2d 288, 293-94 (5th Cir. 1993) (citing *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.1986), *cert. denied*, 483 U.S. 1022 (1987)).  However, plaintiff maintains, proof of malice or evil motive is not necessary.  *Stevenson,* 987 F.2d at 294 (citing *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir.1983); *Jones v. Credit Bureau of Huntington, Inc.*, 399 S.E.2d 694, 703 (1990)); *Thornton v. Equifax, Inc.*, 619 F.2d 700, 705 (8th Cir. 1980).  Plaintiff argues that whether an act is done with willfulness is an issue of fact for a jury.  *See Thibodeaux v. Rupers,* 196 F.Supp.2d 585, 592 (S.D. Ohio 2001) (stating, "questions involving a party's state of mind are generally appropriately resolved by a jury rather than on summary judgment").  Plaintiff contends that she need only produce sufficient evidence to establish that there was a failure to comply with the FCRA, and that the failure was willful.  *See Rhodes v. Ford Motor Credit Co.,* 951 F.2d 905, (8th Cir. 1991) (finding plaintiff failed to produce evidence

---

[28] *See* 15 U.S.C. § 1681n(a) (discussed *supra*).

that defendant acted willfully, as required to bring state law actions for defamation and negligence against credit reporting agencies).

It is plaintiff's position that SSA conducted a superficial and unreasonable inquiry. Plaintiff notes that according to O'Hara's testimony, upon receiving the CDV, the company's agent simply verified that her personal information matched that in the company's records. According to plaintiff, if a furnisher is simply parroting the information that is reported by the CRA, then a meaningful, reasonable investigation will never take place. Plaintiff asserts that courts have determined that the type of cursory investigation involved here is not in line with the underlying theme of the FCRA. Plaintiff highlights the following passage from *Crane v. Trans Union, LLC,* 282 F.Supp.2d 311 (E.D. Pa. 2003), which discusses the rational of *Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir.1997):

> By requiring "something more than mere[ ] parroting" by CRAs, *Cushman* teaches that the FCRA uses the word "accuracy" more "objectively" than TU would prefer. An objective understanding of accuracy requires congruence between the legal status of a consumer's account and the status a CRA reports. Put another way, a consumer report cannot be "accura[te]" under either section 1681e(b) or section 1681i if it contains information that is legally incorrect.

282 F.Supp.2d at 318 (footnote omitted) (brackets in original).

Not only is parroting by the furnisher a problem, plaintiff contends, the use of the CDV adds to an already poor investigation procedure. Plaintiff draws the court's attention to the following passage from Hendricks' affidavit:

> . . . [T]he CDV-exchange is prone to defects. For instance, in this case, Equifax's CDV (12/01/03) to Speedway included plaintiff's correct street and P.O. Box addresses. However, Speedway responded by only checking the boxes indicating that it had identical identifiers for name and SSN. This implied that Speedway lacked identical identifiers for the addresses or for date-of-birth. Despite these discrepancies and omissions, Speedway then instructed Equifax to "modify" Ms. Robinson's tradeline

40

so it had an "R-9" status (charge-off), instead of an "R-5" status lived.  This not only
made the account more derogatory from a credit scoring perspective, it also meant that
many lenders would not grant credit to Ms. Robinson unless she paid off the charge off
or otherwise resolved it.

(Hendricks Affid., p. 13).

Plaintiff maintains that a CDV exchange, such as that at issue here, is not an acceptable

investigatory procedure in the case of an identity theft victim.  Plaintiff argues that SSA should have

performed a more detailed inquiry into her record, which would have revealed that there was no

confirmation that the signature on the guarantee was hers.  Further, plaintiff asserts, SSA did not even

follow its own written procedures when it investigated her dispute.  Hendricks stated:

> . . . Speedway did not even follow its own *written* procedures, which directed it not to
> rely exclusively on the CDV exchange.  Specifically, the page in its "Disputes" manual
> directed it to "verify by name, SSN and address."  However, as noted above,
> Speedway's CDV response did not verify by address.  In addition, the page states:
> "Research on fische (SIC) or microfilm only what is being disputed.  Such as: Provide
> completed ID, which means provide credit bureau with copy of application. . . d) ...
> Make copy of complete dispute and attach any back up information that you have
> pulled from fische (SIC) or microfilm and put in our dispute file."  However, Mr.
> O'Hara's testimony indicated that these steps were not taken.

(Hendricks Affid., p. 13).

According to plaintiff, SSA did not report accurate information to Equifax after it performed its

investigation.  Plaintiff notes that a consumer report is "inaccurate when it is 'patently incorrect' or when

it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse [ ]'

effect."  *Dalton v. Capital Associated Industries, Inc*., 257 F.3d 409, 415 (4th Cir. 2001) (quoting

*Sepulvado v. CSC Credit Servs*., 158 F.3d 890, 895 (5th Cir. 1998)) (brackets in original).  Plaintiff

maintains that the report she received after informing Equifax of her dispute was inaccurate because the

SSA account was still reporting.[29]

Plaintiff again compares this case to *Johnson v. MBNA America Bank, NA,* 357 F.3d 426

(4th Cir. 2004), where the Fourth Circuit stated:

> In particular, MBNA relies on testimony that, pursuant to its five-year document
> retention policy, the original account application was no longer in MBNA's possession.
> Even accepting this testimony, however, a jury could reasonably conclude that if the
> MBNA agents had investigated the matter further and determined that MBNA no
> longer had the application, they could have at least informed the credit reporting
> agencies that MBNA could not conclusively verify that Johnson was a co-obligor.

357 F.3d at 432 (footnote omitted).

According to plaintiff, SSA's lack of a detailed and systematic inquiry into her record

demonstrates that the company's procedures do not meet the standards set forth in *Johnson*.  Even if

SSA had followed their own procedures in her case, plaintiff contends, a reasonable investigation

would not have taken place.  Plaintiff concludes that SSA's procedures are unreasonable, unreliable

and fail to meet a reasonable standard for an identity theft victim.  Plaintiff further contends that a jury

could find that SSA violated 15 U.S.C. § 1681s-2(b), and summary judgment is inappropriate.

## B.    SSA Employs Inadequate Procedures to Prevent Identity Theft.

Plaintiff asserts that the procedures followed by SSA to protect consumers from identity theft

were unreasonable.  Plaintiff maintains that there are simple procedures SSA could have followed that

would have prevented the fraudulent account from being opened.

Plaintiff argues that, under Alabama law, a creditor can be held liable for its actions, or

---

[29] Plaintiff notes that the SSA account continued to be reported to the CRAs as late as
November 29, 2004, after this lawsuit was filed.

inactions, to protect a consumer from identity theft.  In *Patrick v. Union State Bank,* 681 So.2d 1364 (Ala. 1996), plaintiff notes, the Alabama Supreme Court held that "a bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter."  681 So.2d at 1371. Plaintiff notes that, in *Patrick*, the plaintiff's temporary driver's license, which did not contain a photograph, was stolen.  *Id.* at 1365.  An imposter used the driver's license to open a checking account.  *Id.*  The imposter did not provide the bank employee with an address, claiming that she lived in a shelter for abused women.  *Id.*  Further, plaintiff points out, the imposter did not sign her complete name, and her signature did not match the one on the driver's license.  *Id.*

Plaintiff also discusses *Smith v. AmSouth Bank, Inc.*, 892 So.2d 905 (Ala. 2004), a case relied upon by SSA.  In *Smith*, plaintiff notes, a wholesale automotive dealer doing business under the name of Specialty Motor Cars, hired an individual named Utsey to purchase and sell vehicles on his behalf.  892 So.2d at 907.  Utsey formed a corporation named JCU and opened a corporate checking account at an AmSouth Branch in the name of  JCU d/b/a Specialty Motor Cars.  *Id.*  Smith had no knowledge of the account.  *Id.*  Utsey deposited checks made out to Specialty Motor Cars in the JCU account, and Smith sued AmSouth, claiming negligence in opening the account.  *Id.*  The court ruled that AmSouth did not own Smith a duty to prevent the conversion, distinguishing the facts from those in *Patrick*.  *Id.* at 909.  Unlike the bank in *Patrick*, the *Smith* court found that AmSouth did not have any kind of relationship with Smith.

Plaintiff takes issue with SSA's contention that foreseeability is the crux of the *Smith* decision. According to plaintiff, the issue in *Smith* was whether or not AmSouth thought it had a relationship with

Smith.  Plaintiff argues that the facts in *Patrick* are unlike those in *Smith* because AmSouth had no

relationship with Smith and no reason to know who Smith was:

> In *Patrick*, we stated that at least the defendant bank "thought that it had a relationship
> with Ms. Patrick." 681 So.2d at 1369 (emphasis added). That is, when Union State
> Bank opened the account for the impostor, the bank believed that it was dealing with
> Bridgette Lashawn Patrick, who was assigned a specific Social Security number and
> who had specific characteristics, e.g., eye color, hair color, as listed on her temporary
> driver's license. A description of the impostor was not provided in *Patrick*, yet even if
> her characteristics were similar to Patrick's, and even, against all odds, if the impostor's
> name was "Bridgette Lashawn Patrick," at least one critical distinction would lie in the
> Social Security number, as to which Union State Bank did not seek verification.
> *Patrick*, 681 So.2d at 1365.

*Smith*, 892 So.2d at 909.

It is plaintiff's position that the present case is in line with *Patrick*, not *Smith*.  Plaintiff argues

that SSA thought it had a relationship with her, just as Union State Bank thought it had with Patrick.

Further, plaintiff asserts, SSA initially denied the application by Dunn in March 2002, asking for the

credit account to be guaranteed by an officer of the business.  After receiving the guarantee, allegedly

signed by plaintiff, SSA checked her credit record.  Plaintiff also notes that SSA contacted her by letter

and phone in an effort to collect the debt.  Therefore, plaintiff concludes, SSA clearly believed it had a

relationship with her.  Plaintiff maintains that a credit card company, such as SSA, is comparable to a

bank, and its duty to use safety procedures to protect against fraud in the opening of accounts should

be the same as that of a bank.

Plaintiff highlights Stivers' affidavit testimony, which details standard procedures which allegedly

would have prevented the forgery had SSA used them:

> Speedway management's failure to reinvestigate guarantor applications, to properly
> verify their identity, jeopardizes the privacy and financial security of those such as Ms.

44

Robinson, and could have been avoided, with minimal effort.  Historically, surveys have revealed that consumers generally approve of action that is taken to keep them safe, whether in a physical or in a financial sense.  Speedway management elected not to take action to protect credit co-signers that entities in the industry have taken.

Proper thorough verification of the identity of a mortgage loan applicant, or an applicant for an automobile loan or other type of credit for a large amount, according to finance industry standards, would include the following requests, on the part of someone at each entity directly participating in a home mortgage, automobile loan, or some other types of high-limit credit applications:

 a.  meeting in person with the loan applicant

 b.  visual inspection of the driver's license, to verify it is the loan applicant

 c.  comparison of signatures, on the driver's license, with the paperwork

 d.  confirmation that applicant resides at the address on the application

 e.  check authenticity of credit identifying information if there is a question

 f.  ask for a statement from the applicant's bank (or other account type) to ascertain that downpayment to be tendered has not been borrowed

 g.  verification, that applicant does work at the listed place of employment

 h.  for a mortgage, re-verification of the above, in the days before closing

(Stivers Affid., p. 10).  Plaintiff maintains that by performing a simple verification procedure, such as those described by Stivers, SSA could have avoided the current situation.  Plaintiff notes that SSA could have requested a copy of her diver's license, a telephone call or a meeting with her.

Although SSA should not have opened the account, plaintiff argues, it had numerous chances prior to the reinvestigation request to update the account and correct the inaccurate reporting.  Plaintiff contends that she spoke with SSA's agents on at least two occasions.  Plaintiff contends that, on both occasions, she informed the agent that the account was not hers.  She highlights the following portion of

her deposition testimony:

> Q:     Is that [the first call] the one and only call that you have ever had about this account?
>
> A:     Someone else called me.  Another guy called me sometime later to reach an agreement with me to have me to pay not all of the amount that was due but a portion of the amount that was due.
>
> Q:     Who was that that called you?
>
> A:     I don't know.
>
> Q:     Was it a collection agency?
>
> A:     I'm assuming that it was.
>
> Q:     Did you ask him where he was calling from?
>
> A:     I'm quite sure he told me.  I don't remember.
>
> Q:     What did you say to him?
>
> A:     I – I'm quite sure I told him the same thing.  That I don't have a Speedway account.  But he told me an amount that they would be willing to accept and for me to call him back and let him know what I was going to do about the account.

(Robinson Depo., p. 31).

According to plaintiff, SSA had numerous chances to investigate and correct the account, but failed to do so.  She points to Hendricks' following testimony:

> Ms. Robinson testified she was first informed about the fraudulent account when a debt collector for Speedway called her and demanded payment.  Ms. Robinson testified that she flatly told the Speedway agent that she never had a Speedway account.  However, it appears that Speedway never investigated this dispute.  Had Speedway investigated the account, it likely would have checked the original application and seen that the original applicant, Mr. Dunn, was turned down, and then returned with an alleged guarantor, per Ms. Robinson's forged signature.  Such an investigation also could have revealed that Speedway accepted the guarantor's signature without any form of authentication, like a copy of a driver's license or in-person meeting.  Instead, Speedway disregarded this dispute and sent Ms. Robinson a collection letter.  Mr. O'Hara's testimony indicated that the collector did not even record Ms. Robinson's dispute in Speedway's internal records.  This indicated that Speedway was not concerned with the truthful information Ms. Robinson gave it; only that it collect the

outstanding money—from whomever.[30]

> Thus, Speedway could have prevented the entire situation by being more diligent about the signatures of guarantors.  Or, it could have promptly reversed the problem after its collector was told by Ms. Robinson that the account was not hers.  Despite all of this, had Speedway at least taken the rudimentary step of reporting to the credit bureaus that Ms. Robinson tradeline was "in dispute," it would have greatly decreased the damage to her credit.  This is because tradelines that are reported as "in dispute" generally are not scored in FICO scoring models.  However, by reporting it as actually owed, Speedway was improperly using credit reporting as an arm of debt collection, as it knew Ms. Robinson would be greatly impaired from obtaining credit unless the charge off was resolved.[31]

(Hendricks Affid., pp. 11-12).

Plaintiff asserts that SSA's inaction was willful.  Plaintiff argues that SSA intentionally made no effort to update or correct that data when it was informed that the account was not hers.  Plaintiff concludes that defendant knowingly committed actions in conscious disregard for her rights.  Plaintiff points to her testimony that the SSA collection agents who called her were rude, and argues that SSA was only concerned about collecting the debt and not about whether the account was truly hers.

----

[30] SSA moves to strike this sentence from Hendricks' affidavit.  According to SSA, this sentence is inadmissible testimony as to the mental operations of another.  Moreover SSA argues, this statement is based solely on speculation and conjecture, and not upon personal knowledge.

[31] SSA moves to strike this sentence for the same reasons as given in the previous footnote.  SSA further moves to strike the following sentence from Hendricks' affidavit:

> For example, in a mixed file situation, which appears to be the case here, where the (*sic*) Experian is merging data on two distinct individuals because of similarities in their identifiers, a comparison of the name and SSN held by the CRA and furnisher accomplishes very little as investigative step for determining the truth.

(Hendricks Affid., p. 12).  According to SSA, this sentence is confusing, irrelevant, and not based upon personal knowledge.  Moreover, SSA argues, it is based upon speculation and conjecture, as there is no evidence that supports the conclusion the Robinson's data has been merged with anyone else's data.

Further, plaintiff maintains, following their telephone conversations with her, SSA's agents should have made a note in her file that she claimed the account was not hers.  Had they done so, plaintiff contends, SSA may have done a more thorough investigation when it received the dispute notice from Equifax.

### C.  Plaintiff Has Established Actual Damages Arising From the Alleged Violations of FCRA 15 U.S.C. § 1681s-2(b).

Plaintiff maintains that a consumer can establish damages under the FCRA by merely showing that a consumer reporting agency issued an erroneous report to an institution with which the consumer is dealing.  *Hyde v. Hibernia Nat. Bank in Jefferson Parish*, 861 F.2d 446, 449 (5th Cir. 1988), *cert. denied*, *Credit Bureau Services-New Orleans v. Hyde*, 491 U.S. 910 (1989).  Plaintiff contends that the FCRA permits recovery for damages to credit rating, anxiety, embarrassment, and future damages.  *See Bruce v. First U.S.A. Bank, Nat. Ass'n,* 103 F.Supp.2d 1135, 1144 (E.D. Mo. 2000) (citing *Stevenson v. TRW Inc*., 987 F.2d 288, 296-97 (5th Cir.1993), for the proposition that "emotional distress damages may include damages for embarrassment, humiliation and mental anguish"); *Jones v. Credit Bureau of Huntington, Inc*., 399 S.E.2d 694, 699-700 (W. Va. 1990) (stating that a plaintiff can recover for humiliation and mental distress under the Act).  Further, plaintiff argues, the FCRA permits recovery for loss of time and out-of-pocket expenses for attorney's fees incurred prior to litigation of a claim.  *See Casella v. Equifax Credit Information Services,* 56 F.3d 469, 474 (2nd Cir. 1995) (stating, "[t]he term 'actual damages' may include out-of-pocket expenses for attorney's fees incurred by a plaintiff prior to litigation of his FCRA claims"); *Thomas v. Trans Union Credit Information Co.,* 1992 WL 280516 at *4 (N.D. Ill. 1992) (denying summary judgment when plaintiff claimed damages for: "(1) expenditure of time and money to secure credit at unfavorable rates of

interest; (2) humiliation and embarrassment; and (3) payment of attorney's fees to correct the alleged

inaccurate information compiled and generated by [the CRA]").

In addition, plaintiff states, a consumer need not even prove out-of-pocket expenses in order to

recover actual and punitive damages. *See Stevenson v. TRW Inc.*, 987 F.2d 288, 298 (5th Cir. 1993)

(stating, "[a]ctual damages include humiliation or mental distress, even if the consumer has suffered no

out-of-pocket losses"); *Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509, 514 (5th

Cir. 1982) (approving award of damages for mental distress and humiliation where there were no out-

of-pocket expenses). Plaintiff maintains that the FCRA permits recovery for damages due to injury to

reputation and credit worthiness. *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143,

148 (5th Cir. 1983).[32] According to plaintiff, courts have also held that loss of reputation can be

inferred from the nature of a false publication that reflects adversely on a consumer. *See Collins v.*

*Retail Credit Co.,* 410 F.Supp. 924, 927, 932 (E.D. Mich. 1976) (finding that loss of reputation could

---

[32] The *Fischl* court stated:

> [A]ctual damages may include out-of-pocket monetary losses, injury to credit
> reputation and mental anguish, humiliation or embarrassment. *Anderson v. United*
> *Finance Co.*, 666 F.2d 1274 (9th Cir.1982); *Owens v. Magee Finance Serv. of*
> *Bogalusa, Inc*., 476 F.Supp. 758 (E.D.La.1979). Punitive damages may be awarded
> pursuant to § 1691e(b), regardless of proof of actual damages, if the creditor's conduct
> is adjudged wanton, malicious or oppressive, or if it is deemed to have acted in reckless
> disregard of the applicable law. *Anderson; Shuman v. Standard Oil Co.*, 453
> F.Supp. 1150 (N.D.Cal.1978) (dicta ). *See Sayers v. General Motors Acceptance*
> *Corp.*, 522 F.Supp. 835 (W.D.Mo.1981); *Cherry v. Amoco Oil Co.*, 490 F.Supp.
> 1026 (N.D.Ga.1980). Finally, attorney's fees are available if an award of actual or
> punitive damages is made. 15 U.S.C. § 1691e(d).

708 F.2d at 148.

be inferred from false credit report which "alleged excessive drinking habits and alleged instances of

low moral character").

To demonstrate her damages, plaintiff highlights her testimony that she was initially denied

refinancing on her home by Key Financial because of the SSA account on her credit report:

| | |
|---|---|
| Q: | Tell me about you said you were going to refinance [your house] and they turned you down due to the Speedway account and the AmSouth account. |
| A: | Yes, uh-huh. |
| Q: | What specifically were you told about the reasons for rejecting your refinancing? |
| A: | The accounts were I guess not – for nonpayment on the accounts. |
| Q: | Were you responsible for paying the AmSouth account? |
| A: | Yes. |
| Q: | And you had not been paying them? |
| A: | Yes.  I was making payments.  I have an arrangement with them.  I'm making payments to AmSouth and I told her that, and she said she needed something in writing from AmSouth. |
| Q: | Did you do that? |
| A: | and the Speedway account and I told her that the Speedway account was not mine[].  And she said that I would have to get that taken care of. |
| Q: | Did you get her a letter from AmSouth? |
| A: | No.  I didn't.  Because she had turned me down.  I was turned down for those reasons – for the reasons with Speedway. |
| Q: | And – |
| A: | I could have gotten AmSouth's letter, but I still had Speedway to deal with. |
| Q: | Okay. |
| A: | And I told her that it was not my account and I wasn't going to pay it. |

(Robinson Depo., pp. 66-67).

According to plaintiff, she did eventually obtain financing from Key Financial, but she received a

variable rate.  She has submitted mortgage documents reflecting her variable rate.  Plaintiff maintains

that she was damaged by SSA's failure to remove the account from her credit report, because she was

unable to obtain a fixed-rate mortgage.  Plaintiff points to Stivers' following testimony:

> On page # 68 of Ms. Robinson's deposition, she states that she was later approved to refinance her home by Key Financial, which had rejected her previously, for its "streamline financing" program, that did not require qualifying. Historically, programs such as this require a greater collateral equity position, and charge higher interest rates, with fewer choices of loan terms / conditions. It is an excellent example of how a combined refusal of Equifax and Speedway, to delete this inaccurate Speedway account, closes off her borrowing options.

(Stivers Affid., p. 25). Plaintiff stated that her new mortgage started at an interest rate of 4.75%, lower than her previous mortgage. (Robinson Depo., pp. 75-76). However, Robinson argues, because the rate is variable, it will increase significantly each year.

Plaintiff further maintains that she has suffered damage to her creditworthiness. She draws the court's attention to Hendricks' testimony that:

> [The Speedway account] was seriously damaging to Ms. Robinson's credit score because a major derogatory like a charge off, which is between 0-11 months old can have a 93 percent negative impact; a major derogatory between 12-23 months old, has about a 60 percent negative impact on a credit score, according to Fair Isaac Corp., the creator of the FICO scoring model which serves as the basis of scoring models sold by Equifax, Trans Union and Experian. Thus, in my opinion, the Speedway account was having a major negative impact on her credit score.

(Hendricks Affid., p. 15).

Additionally, plaintiff asserts that, as demonstrated by her deposition testimony, *see supra*, SSA's actions have caused her to be upset, frustrated, embarrassed, angered, and humiliated.

## III. SSA's Reply.

### A. Introduction.

SSA disputes plaintiff's position that she did not know that the personal guarantee was forged when she was contacted by the company regarding the credit account. SSA highlights plaintiff's following testimony as evidence that she suspected that Dunn had forged her signature and used her

personal information when opening the account:

> Q:    When did you approach [Dunn] about the account?
> A:    Sometime after that guy called me.
> Q:    What did you say to him?
> A:    I asked him – I told him that someone called me about a Speedway account and I asked him if he had opened something up in my name without my approval, and he said that he used me as a reference.
> Q:    Did you know that the account existed at all before then?
> A:    No.
> Q:    Did he tell you he was going to use you as a reference before he opened the account?
> A:    No.
> Q:    What made you think that he might know something about the account?
> A:    I don't know of anyone else who would have done that.
> Q:    Did the collection person that called you say anything about Lethal's Landscaping or Charles Dunn?
> A:    I think – I think he did mention Lethal's Landscaping.
> Q:    So you had an idea that you could go to Mr. Dunn to find out about that account?
> A:    Yes.

(Robinson Depo., pp. 25-26).  SSA notes that Robinson did not inform SSA of her suspicions

concerning Dunn:

> Q:    After talking to Mr. Dunn and realizing what he had done, did you try to contact [the collector] about the account?
> A:    Contact?
> Q:    The collector?
> A:    No I didn't.
> Q:    Did you do anything about trying to find out more about the account?
> A:    No.

(*Id.* at pp. 29-30).  SSA also points to Robinson's testimony that she foresaw that Dunn might forge

her signature, because he had done so on two other credit accounts.  (*Id.* at pp. 143-44).

SSA maintains that, contrary to Robinson's arguments, this is not a case of identity theft.  SSA

asserts that Robinson freely gave her personal information to Dunn with her permission to use the

information to procure certain credit accounts.  SSA again contends that it had no knowledge of

Dunn's fraud until after conducting discovery in this case.

### B.  SSA Conducted a Reasonable Investigation Based Upon the Information Provided to It by Robinson through Equifax.[33]

SSA contends that the reasonableness of a furnisher's investigation is directly correlated to the

information provided to it by the consumer through the CRA.  SSA observes that § 1681s-2(b)(1) of

the FCRA states that, once a CRA notifies a furnisher of a consumer dispute, the furnisher shall "review

all relevant information provided by the consumer reporting agency," and "conduct an investigation with

respect to the disputed information."  15 U.S.C. § 1681s-2(b)(1)(A)–(B).  To facilitate this, the CRA

is required to promptly provide the furnisher with "all relevant information regarding the dispute that the

agency has received from the consumer."  15 U.S.C. § 1681i(a)(2)(A).  Thus, SSA concludes, the

scope of the information a furnisher is required to investigate is defined by what the consumer directs it

to investigate through her dispute with the CRA.  SSA argues that a furnisher is not required to

investigate all possibilities of a consumer dispute, and that doing so would be unreasonable.[34]  SSA

reasserts its argument that it conducted a reasonable investigation, as demonstrated by the similar cases

of *Malm v. Household Bank (SB), N.A.,* No. Civ. 03-4340ADMAJB, 2004 WL 1559370 (D. Minn.

---

[33] SSA again notes that, as a matter of law, Robinson's FCRA claims arose only after SSA's receipt of the CDVs.  Therefore, SSA argues, any alleged actions or omissions by it before that time are irrelevant.

[34] Moreover, SSA asserts, a furnisher is not required to contact every consumer that disputes her account information.  *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (stating "requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA").  SSA further argues that it would have served no purpose for it to contact Robinson after receiving th CDV because it had already contacted her before receiving notice from the CDV form and it had received no response.

July 7, 2004), *Westra v. Trans Union LLC,* No. 03 C 1181, 2004 WL 1794482 (N.D. Ill. August

05, 2004), and *Schmit v. Trans Union LLC,* No. 03 C 1643, 2004 WL 785098 (N.D. Ill. April 12,

2004).  SSA argues that plaintiff has not cited any law to refute these cases or addressed the issue.

      According to SSA, the only case cited by plaintiff to support her contention that SSA's

investigation was unreasonable, *Johnson v. MBNA America Bank, NA,* 357 F.3d 426 (4th Cir.

2004), does not fit the facts of this case.  SSA observes that the plaintiff in *Johnson* alleged that she

was not responsible for the charges made to her husband's account because "she was merely an

authorized user and not a co-applicant."  357 F.3d at 428-29.  In contrast to the facts at issue here,

SSA contends, in *Johnson*, the documents sent by the credit reporting agencies to the furnisher

"specifically indicated that Johnson was disputing that she was a co-obligor on the account."  *Id.* at

429.  SSA points out that, despite this specific information, MBNA only looked at its computer files,

where it confirmed the plaintiff's name and address and noted that she was identified as the sole

responsible party on the account.  *Id.* at 431.  Moreover, SSA notes, "[t]he MBNA agents . . . testified

that, in investigating consumer disputes generally, they do not look beyond the information contained in

the [computer] and never consult underlying documents such as account applications."  *Id.*  The

*Johnson* court concluded that a jury could, based on this evidence, reasonably find that MBNA acted

unreasonably.  *Id.*

      In this case, SSA contends, plaintiff did not give specific information concerning her dispute.

Instead, she merely claimed that the account was not hers.  Further, SSA argues, it nevertheless looked

to both its computer files and physical files, which included the application and personal guarantee.

However, SSA asserts, it was not given information disputing the authenticity of the application or the

personal guarantee.  Therefore, SSA argues, *Johnson* does not apply here.[35]

SSA again points out that the Research Request Form filed out by plaintiff and sent to Equifax did not contain any indication that the personal guarantee had been forged.  SSA further states that neither plaintiff nor her attorneys ever attempted to contact anyone at SSA to inform the company of the possible forgery.  Now, SSA continues, plaintiff argues that the CDV process is inherently defective.  In any event, SSA maintains, the issue of whether or not the CDV process was prone to defects does not implicate any liability on the part of SSA.  In response to Robinson's argument that the CDV exchange that took place was not an acceptable means to follow in the case of an identity theft victim, SSA again maintains that it was never notified that plaintiff may have been such a victim.[36]

SSA disputes plaintiff's allegations that the company willfully violated the FCRA by continuing to report the account after receiving the CDV.  According to SSA, plaintiff has no evidence to support her conclusory statements regarding this argument.[37]

------

[35] SSA maintains that *Cushman v. Trans Union Corp*., 115 F.3d 220 (3rd Cir. 1997), and *Crane v. Trans Union, LLC,* 282 F.Supp.2d 311 (E.D. Pa. 2003), also cited by plaintiff, do not address facts similar to this case.  In *Cushman*, SSA notes, the plaintiff specifically reported that credit fraud may have been involved.  115 F.3d at 222.  According to SSA, *Crane* does not even address the reasonableness of an investigation.  282 F.Supp.2d at 317-18.

[36] SSA contends that it has very thorough procedures in place for complaints of application fraud.  The company has produced a copy of this policy as it appears in SSA's Consumer Application Approval and Collection Procedures manual.  According to SSA, these procedures were not utilized in this case because it was never notified that fraud was involved.

[37] SSA notes that plaintiff claims that the company knew as early as 2002 that the account was not hers.  Presumably, SSA argues, plaintiff bases this conclusion on her having allegedly received two phone calls in 2002 seeking collection on the account.  SSA maintains that there is no evidence that these callers were SSA employees.  Plaintiff testified that she did not know who those callers were. (Robinson Depo., pp. 30-31).  SSA maintains that plaintiff has no evidence that she ever spoke directly with anyone at SSA.

### C.      SSA Was Not Negligent with Regard to the Personal Guarantee.

SSA maintains that it was not negligent in accepting the personal guarantee.  SSA notes that it contacted plaintiff directly, via the November 7, 2002 letter, about the personal guarantee, and that no adverse action was taken against her with regard to the account until after that communication. Specifically, SSA observes, plaintiff argues that the company could have called or met with her, or requested a copy of her driver's license prior to accepting the personal guarantee.  However, SSA asserts, plaintiff was asked to call SSA in the November 7, 2002 letter, but she chose not to respond.

SSA disputes plaintiff's reliance on *Patrick v. Union State Bank,* 681 So.2d 1364 (Ala. 1996).  In *Patrick*, SSA argues, the bank never attempted to contact the plaintiff.  Further, SSA asserts, the plaintiff in *Patrick* was truly a victim of identity theft, unlike Robinson, who gave her personal information to her boyfriend.  Moreover, SSA contends, unlike in *Patrick*, the act that adversely affected plaintiff here was not the opening of the SSA account.  SSA notes that the account was not opened in plaintiff's name, and it remained in the name of Lethal's Landscaping until after plaintiff received the November 7, 2002 letter.

### D.      Robinson's Defamation Claim.

SSA notes that, in her Response Brief, plaintiff put forth no opposition to SSA's Motion for Summary Judgment regarding her defamation claim.  Therefore, SSA concludes, it should be granted. *See* Fed. R. Civ. P. 56(e) (stating "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading . . . If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party").

### E.      Robinson's Entitlement to Damages.

According to SSA, plaintiff is not entitled to actual or punitive damages in this case. SSA notes that no alleged injury that occurred prior to SSA's investigation of the account pursuant to the CDV should be considered with regard to plaintiff's FCRA claims. SSA asserts that plaintiff had no private right of action against it for initially reporting the account. Therefore, SSA maintains, as Key Financial turned down her application for refinancing before she disputed the SSA account, the company cannot be liable for any damages she suffered as a result of that denial. SSA highlights plaintiff's following testimony:

> Q:  After you had attempted to refinance your home with Key Financial, what did you do about the Speedway account?
> A:  I contacted Pete Mackey, and he said he didn't handle cases like that and referred me to Mr. Underwood.
> Q:  Did you try to contact Speedway?
> A:  No.
> Q:  When after that did you file your dispute with Equifax?
> A:  How soon after my conversation with --
> Q:  Ho soon after Key Financial rejected your refinancing?
> A:  That was – let me see. It was some months later.

(Robinson Depo., pp. 71-72).

## CONCLUSIONS OF THE COURT

The court examines plaintiff's following remaining claims against SSA: (1) SSA failed to conduct an adequate investigation of her dispute in accordance with the FCRA; (2) SSA defamed plaintiff by publishing directly, and not through CRAs, false information concerning the credit account; and (3) SSA negligently and/or wantonly/willfully permitted Dunn to fraudulently submit the personal guarantee and open the account.

Plaintiff may have summed up this case when she stated, "So I am embarrassed because I had

to file this lawsuit." The case does appear to be an embarrassment. Although the plaintiff was aware that "Lethal" had allegedly forged her name, and although she was aware that SSA's position was that she had signed a guarantee, she never saw fit to advise SSA of an alleged forgery. It was perfectly reasonable for SSA, in the absence of any such assertion, to rely upon the documents it had in hand. A simple denial of having an account, in the view of the knowledge that the plaintiff had, was not sufficient to trigger further investigation. Whether her aim was to protect "Lethal" or otherwise, her own approach was unreasonable under the circumstances. The motion will be granted.

This 22nd of July, 2005.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

58